# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| RED STROKES ENTERTAINMENT, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:12-cv-0008** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| LISA A. SANDERSON, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court is the defendant's Motion to Dismiss or Transfer (Docket No. 2), to which the plaintiff has responded (Docket No. 10). Also before the court is the Plaintiff's Motion to Strike (Docket No. 13). For the reasons discussed herein, both motions will be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Red Strokes Entertainment, Inc. ("Red Strokes"), is a production company owned by the musician Garth Brooks that produced various film and television projects. (Docket No. 4 ¶ 3; Docket No. 10 at 5.) The company was formed in 1994 in Nashville, Tennessee, where it currently maintains an office.[1] The defendant, Lisa A. Sanderson ("Sanderson"), is a California resident who was formerly employed by Red Strokes as its General Manager and

---

[1] A Business Information Search performed on the website of the Tennessee Secretary of State revealed that Red Strokes was formed in Davidson County, Tennessee in 1994 and that the company currently maintains an office in Nashville. *See* http://tnbear.tn.gov/Ecommerce/FilingSearch.aspx (last visited April 20, 2012).

Case 3:12-cv-00008   Document 18   Filed 05/01/12   Page 1 of 31 PageID #: 185

served in that capacity from the date of the company's inception until its winding down sometime in 2010 or 2011.[2]  (Docket No. 4 ¶¶ 2-3; Docket No. 10, Ex. 1 ¶ 4.)

In this suit, Red Strokes alleges that it made a loan to Sanderson in the principal amount of $223,738.21 ("the loan").  (Docket No. 1 at 7.)  It also alleges that it loaned Sanderson "$2,399.61 to satisfy various State of California tax liens . . . and to satisfy various withholding orders."[3]  (Id. at 8.)  Sanderson has allegedly defaulted on both of these loans and Red Strokes now seeks to recover the amounts it is owed, in addition to pre- and post-judgment interest, reasonable attorney's fees, and costs.  (Id. at 2-3.)  Moreover, according to Red Strokes' Complaint, Sanderson claims that she is entitled to a production fee and either a severance or retirement payment from the company.  (Id. at 2.)  Red Strokes, however, alleges that Sanderson agreed and understood at all times that there was no agreement between the parties concerning any severance or retirement plan.  (Id.)  It thus seeks a declaratory judgment providing that: (1) no employment contracts exists between itself and Sanderson; and (2) that Red Strokes does not owe Sanderson any production fee or any severance or retirement payments.  (Id. at 3.)

---

[2] In support of its opposition to Sanderson's motion, Red Strokes filed the Affidavit of Cheryl S. Harris ("Harris Affidavit").  (Docket No. 10, Ex. 1.)  Ms. Harris is a member of O'Neil Hagaman, PLLC ("O'Neil Hagaman"), a Nashville-based business management firm that provided accounting services to Red Strokes, and she states that Red Strokes wound down its operations sometime in 2010 or 2011.  (Id. ¶¶ 2-4.)  The information obtained from the Business Information Search performed on the website of the Tennessee Department of State nonetheless reveals that the company currently maintains an active status.  See http://tnbear.tn.gov/Ecommerce/FilingSearch.aspx (last visited April 20, 2012).  Red Strokes has not offered the court any additional details concerning its current corporate status or the extent of its operations.

[3] Neither party refers to this smaller loan in making their respective arguments concerning personal jurisdiction and venue.

2

On November 16, 2011, Red Strokes commenced this action in the Circuit Court for Davidson County.  (Docket No. 1.)  Sanderson subsequently filed a Notice of Removal on January 5, 2012.  (*Id.*)  On the same date, she filed the pending motion seeking dismissal on the grounds that: (1) she is not subject to personal jurisdiction; and (2) venue is improper in this district.  (Docket No. 2.)  Alternatively, Sanderson requests that the court transfer this action to the Central District of California.  (*Id.*)

In support of her motion, Sanderson provides her declaration.  (Docket No. 4.)  She states that she has lived and worked in Los Angeles County, California for over 25 years.  (*Id.* ¶ 2.)  According to her declaration, Sanderson currently owns a home in Culver City, California and does not own any property in Tennessee.  (*Id.*)  Sanderson claims that during the course of her employment with Red Strokes, the company maintained its office in the Los Angeles area and did not conduct any business in Tennessee.  (*Id.* ¶¶ 3-5.)  She states that her employment with the company ended in December of 2010 and that she is currently unemployed.  (*Id.* ¶¶ 3, 11, 16.)

Between approximately 2005 and 2007, Sanderson states that she was involved in a child custody dispute regarding her son.  (Docket No. 4 ¶ 7.)  During this time period, she says she confided in her close friend and Red Strokes President and sole-shareholder, Mr. Brooks, and expressed anxiety about her ability to afford competent legal representation.  (*Id.* ¶¶ 6-7.)  According to Sanderson, Brooks stated on numerous occasions that Red Strokes would take care of any legal fees she incurred in connection with the custody dispute and that she would not have to repay those fees.  (*Id.* ¶ 7-8.)  Pursuant to this understanding, Sanderson states that she hired the Los Angeles law firm of Wasser, Cooperman & Carter to represent her and that Red Strokes,

3

with Brooks' approval, paid all of the firm's invoices until the custody dispute was resolved in October of 2007. (*Id.* ¶¶ 8-9.)

Sanderson maintains that Red Strokes' payment of her legal fees was a gift instead of a loan and claims that neither Brooks nor the company ever demanded that she repay those fees. (Docket No. 4 ¶¶ 10, 13.) In support of this assertion, Sanderson points to a 2009 conference call in which she, Brooks, and Red Strokes Executive Assistant Anka Brazzell participated. (*Id.* ¶ 10.) Sanderson claims that, when the topic of Red Strokes' prior payment of her attorney's fees arose, Brooks stated that those fees were a gift that did not have to be repaid. (*Id.*)

In support of its response, Red Strokes filed the Affidavit of Cheryl S. Harris ("Harris Affidavit"). (Docket No. 10, Ex. 1.) Harris states that she is a member of O'Neil Hagaman, PLLC ("O'Neil Hagaman"), a business management company located in Nashville, Tennessee, and that her firm was retained by Red Strokes in 1994 to provide various accounting services. (*Id.* ¶¶ 2-3.) According to Harris, her work in connection with "the Red Strokes account encompassed management of all accounting and tax responsibilities including accounts payable, payroll, cash receipts, general ledger maintenance . . . and overseeing commercial insurance and employee benefits."[4] (*Id.* ¶ 3.). She states that she worked closely with Sanderson and that Sanderson maintained regular contact with O'Neil Hagaman from the time of Red Strokes' corporate inception until its winding down sometime in 2010 or 2011. (*Id.* ¶ 4.) Harris also asserts that Red Strokes currently does not have an office or any employees in California and that

---

[4] Ms. Harris also managed the preparation of federal and state income tax returns, payroll tax returns, business tax registrations, and corporate annual reports. (Docket No. 10, Ex. 1 ¶ 3.)

the company's documents, including its general ledgers and payroll registers, have been maintained in Nashville at all relevant times. (*Id.* ¶ 5.)

In her affidavit, Harris claims that, during the course of her approximately 17-year relationship with Red Strokes, Sanderson maintained regular and consistent contact with Nashville residents and businesses. (Docket No. 10, Ex. 1 ¶ 19.) In support of this assertion, Harris states that Sanderson had continuous and regular contact with Brooks during the time he maintained his principal residence in Nashville between 1994 and 2000 to discuss various business items, including Red Strokes' business plan.[5] (*Id.* ¶¶ 6-7.) Decisions regarding these items were apparently made by both Brooks and Sanderson. (*Id.* ¶ 6.) Harris states that other decisions concerning "payroll, tax preparation, business expense reimbursement, travel reimbursement, and various other administrative operations of Red Strokes were handled and approved in Nashville, with input from Lisa Sanderson, Mr. Brooks, and O'Neil Hagaman."[6] (*Id.* ¶ 8.)

According to the Harris Affidavit, Sanderson also maintained regular contacts with Nashville as a result of her work on specific Red Strokes projects. For example, Harris states that Sanderson negotiated with employees of music companies that were incorporated in Tennessee for the purpose of using music from two of Brooks' albums[7] recorded in Nashville in two movies produced by Red Strokes: *Call Me Claus* (2001) and *Unanswered Prayers* (2010). (Docket No.

---

[5] While no longer his principal residence, Harris states that Brooks continues to maintain a residence in Nashville. (Docket No. 10, Ex. 1 ¶ 6.)

[6] Harris adds that the paychecks for company employees, including Sanderson, were issued from Red Strokes' SunTrust bank account in Nashville. (Docket No. 10, Ex. 1 ¶ 9.)

[7] These albums were *Garth Brooks & the Magic of Christmas: Songs from Call Me Claus* (2001) and *No Fences* (1990).

5

10, Ex. 1 ¶¶ 10-11.)  She adds that Sanderson also visited Nashville several times to plan

business strategy and participate in pre-release marketing for a Red Strokes film project titled *The*

*Lamb*, which was based on the fictional rock singer Chris Gaines.  (*Id.* ¶ 12.)  Sanderson was also

personally involved in Red Strokes' acquisition of the rights to *Sugar Blue*, a book written, in

part, by a resident of Nashville, Tennessee who also happened to be employed by a Tennessee

music company.  (*Id.* ¶ 13.)  Aside from these work-related contacts, Harris claims that

Sanderson also used a Tennessee music company to manage and administer the songwriting and

music publishing credits she held for the song *The Red Strokes*, which was featured on two of

Brooks' albums: *In Pieces* (1993) and *The Hits* (1995).  (*Id.* ¶ 14-15.)

Moreover, Harris states that O'Neil Hagaman administered the loan Red Strokes made to

Sanderson to help her pay the legal fees associated with her child custody dispute.  (*See* Docket

No. 10, Ex. 1 ¶¶ 16-18.)  She claims that Sanderson was only in a position to receive the loan due

to her status as the General Manager of Red Strokes.  (*Id.* ¶ 16.)  After negotiating the loan with

Brooks, Harris states that Sanderson contacted O'Neil Hagaman in Nashville to have Red Strokes

issue her a loan check.  (*Id.* ¶ 17.)  Harris states that Red Strokes made subsequent loan

disbursements directly to Sanderson's attorneys at her request.  (*Id.* ¶ 18.)  Specifically, after

receiving legal bills from her attorneys, Sanderson sent those bills to Harris at O'Neil Hagaman's

office in Nashville before Red Strokes disbursed additional loan funds.[8]  (*Id.*)  The funds for all

of Red Strokes' loan disbursements were drawn from the company's SunTrust bank account in

---

[8] The Harris Affidavit states that Sanderson *presented* her legal bills to Ms. Harris at
O'Neil Hagaman's office in Nashville.  (Docket No. 10 Ex. 1 ¶ 18.)  However, it appears from
Red Strokes' opposition brief that it is taking the position that Sanderson sent those bills to
Harris in Nashville.  (*See* Docket No. 10 at 13.)

6

Nashville.  (*Id.* ¶ 16.)  According to Harris, O'Neil Hagaman recorded all amounts that were loaned to Sanderson on a general ledger account maintained in Nashville.  (*Id.* ¶¶ 5, 18.)

While Sanderson did not file a reply brief, she did submit a supplemental declaration (Docket No. 11) that primarily attempts to address what she claims are "misleading" statements in the Harris Affidavit that "require clarification."[9]  (Docket No. 11 ¶ 2.)  Some portions of the supplemental declaration attempt to rebut claims made in the Harris Affidavit.  Other portions attempt to provide additional context to some of Harris' claims.  For example, while Sanderson acknowledges that Red Strokes is a Tennessee company, she reiterates that its office was located in the Los Angeles area at all times relevant to this suit.  (Docket No. 11 ¶ 3.)  She also emphasizes that virtually all of Red Strokes' business activities involving the development and production of film and television projects occurred in the Los Angeles area.[10]  (*Id.* ¶ 13.)  Although Sanderson acknowledges that Brooks resided in Nashville from 1994 to 2000, she claims that he subsequently moved to Oklahoma, where he now maintains his principal residence.  (*Id.* ¶ 5.)  She adds that her negotiations with Brooks concerning his offer to have Red Strokes pay her legal fees occurred either over the phone while she was in California and he was in Oklahoma, or in person when he visited California.  (*Id.* ¶ 7.)

## ANALYSIS

[9] The supplemental declaration also attempts to respond to an argument raised by Red Strokes in its opposition brief concerning the specificity of certain non-party witnesses Sanderson intends to call at trial.  (Docket No. 10 at 16.)  Red Strokes' argument specifically addresses one of the factors considered when determining whether to transfer an action to another judicial district pursuant to 28 U.S.C. § 1404(a).  (*Id.*)  The portion of the supplemental declaration responding to this argument will be discussed later in this Memorandum Opinion.  *See infra* pp. 24-26.

[10] Sanderson thus slightly retreats from the assertion made in her initial declaration that Red Strokes did not conduct any business in Tennessee.  (Docket No. 4 ¶ 5.)

7

## I.    Motion to Dismiss for Lack of Personal Jurisdiction

In considering a motion to dismiss for lack of personal jurisdiction, a court has three options.  It may (1) rule on the motion on the basis of the affidavits submitted by the parties, (2) permit discovery in aid of the motion, or (3) conduct an evidentiary hearing on the merits of the motion.  *See Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) .  It is in the court's discretion, based on the circumstances of the case, which path to choose.  *Id.*  In any proceeding, however, the party asserting jurisdiction has the burden of proof.  *See Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002).  "Additionally, in the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction."  *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

Where, as here, both sides have submitted competing affidavits and requested a decision on that basis, it is entirely appropriate for the court to decide the jurisdictional issue based on the affidavits presented.[11]  *Theunissen*, 935 F.2d at 1458.  When a court rules on a motion to dismiss for lack of personal jurisdiction based upon the affidavits, the party asserting jurisdiction need only make a *prima facie* showing of jurisdiction to defeat the motion.  *Id.*  In examining whether the party asserting jurisdiction has made this *prima facie* showing, the court is to construe the facts presented in the light most favorable to that party, and the court does not weigh or consider the conflicting facts presented by the other side.  *Bird*, 289 F.3d at 871; *see also Estate of*

---

[11]  Red Strokes expressly requested the court to rule on the affidavits.  (Docket No. 10 at 2.)  In response, Sanderson filed a supplemental declaration and did not otherwise request the court to order further discovery or to conduct an evidentiary hearing.  (*See* Docket No. 11.)

*Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360-61 (6th Cir. 2008) (referring to the plaintiff's burden in this context as "relatively slight").

The issue of whether this court may exercise personal jurisdiction over Sanderson depends on the specific limitations of Tennessee's long-arm statute and the constitutional principles of due process. *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 477 (6th Cir. 2003). Tennessee's long-arm statute has been consistently construed to extend to the limits of federal due process, and, therefore, the two inquiries are merged, and the court need only determine whether exercising personal jurisdiction over Sanderson here is consistent with federal due process requirements. *Id.*

In order for due process to permit the exercise of personal jurisdiction over a non-resident defendant, such as Sanderson, that defendant must have "certain minimum contacts with the [forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Supreme Court has identified "general" jurisdiction and "specific" jurisdiction as distinct bases for personal jurisdiction - a demonstration of the contacts necessary for either basis is sufficient to establish personal jurisdiction. *Id.* at 417-18.

A court may exercise general jurisdiction over a non-resident defendant when his contacts "are so continuous and systematic as to render [him] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, --- U.S. ---, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011) (internal quotation marks omitted). In such instances, a court may exercise jurisdiction over claims that are unrelated to a non-resident defendant's contacts with

9

the forum. *Id.* at 2853-54. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Id.* at 2853.

The assertion of specific jurisdiction "depends on an affiliatio[n] between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 131 S.Ct. at 2851 (internal quotation marks and citations omitted). Unlike general jurisdiction, "specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* The Sixth Circuit has established a three-part test for determining whether the exercise of specific jurisdiction is consistent with the principles of due process ("the *Mohasco* test). *See S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1969). Under this test, the exercise of such jurisdiction is proper if the court finds: "(1) purposeful availment 'of the privilege of acting in the forum state or causing a consequence in the forum state,' (2) a 'cause of action . . . aris[ing] from activities' in the state, and (3) a 'substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.'" *Schneider v. Hardesty*, 669 F.3d 693, 701 (6th Cir. 2012) (*quoting S. Mach. Co.*, 401 F.2d at 381). While a motion to dismiss for lack of specific personal jurisdiction may be maintained based on prongs two and three of the *Mohasco* test, purposeful availment is the *sine qua non*, or absolutely indispensable, element of personal jurisdiction, and, therefore, disputes about whether or not there is specific personal jurisdiction in a given case often rise or fall on the issue of purposeful availment. *See Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550-51 (6th Cir. 2007).

10

In the present case, Sanderson argues that this court lacks both general and specific jurisdiction over her. Accordingly, the court will analyze whether jurisdiction exists under either category.

## A.    Motion to Strike

Before turning its attention to the jurisdictional issues in this case, the court will address Red Strokes' Motion to Strike (Docket No. 13). In its motion, Red Strokes argues that Sanderson's supplemental declaration should be stricken in its entirety, because it contains assertions that contradict facts alleged in the Harris Affidavit. (Docket No. 14 at 2.) While it is true that some portions of the supplemental declaration conflict with the facts alleged in the Harris Affidavit, the court finds that striking it in its entirety is unnecessary. Instead, as the relevant precedents in this Circuit instruct, the court will not weigh or consider the conflicting facts presented by the supplemental declaration in ruling on the pending motion to dismiss for lack of personal jurisdiction. *See Bird*, 289 F.3d at 871; *see also Estate of Thomson*, 545 F.3d at 360.

Alternatively, Red Strokes contends that, to the extent the court does not strike the supplemental declaration in its entirety, it should at least strike out the portions containing inadmissible hearsay. (Docket No. 14 at 2.) In particular, it asserts that paragraph 12, in which Sanderson attempts to describe the testimony of certain potential witnesses, should be stricken.[12] (*Id.* at 2-3.) The court, however, sees no need to strike this paragraph. Instead, it will disregard

_____

[12] It bears noting that the statements contained in paragraph 12 of the supplemental declaration do not enter into the court's jurisdictional analysis, although they do come into play in its consideration of Sanderson's motion to transfer. *See infra* pp. 24-26.

any statements in paragraph 12 that are not based on Sanderson's personal knowledge.  The Motion to Strike will therefore be denied.

## B.    General Jurisdiction

Sanderson argues that she has not maintained the degree of continuous and systematic contacts necessary to permit this court to exercise general jurisdiction.  (Docket No. 3 at 7-9.)  In support of this assertion, she notes that she has lived and worked in California for over 25 years.  (Docket No. 4 ¶ 2.)  In addition, she notes that she owns a home in California and, correspondingly, owns no property in Tennessee.  (*Id.*)  Moreover, while acknowledging that her former employer, Red Strokes, is a Tennessee corporation, she asserts that the company's office has been in California at all times relevant to this dispute.  (Docket No. 4 ¶ 4; Docket No. 11 ¶ 3.)

For its part, Red Strokes asserts that this court may exercise general jurisdiction over Sanderson as a result of her extensive and continuous contacts with Tennessee.  (Docket No. 10 at 4-5.)  In support of this assertion, Red Strokes identifies the following contacts: (1) Sanderson's seventeen-year employment with Red Strokes, a Tennessee company; (2) her continuous and regular contact with Brooks during the time he resided in Nashville between 1994 and 2000 to discuss, among other business items, Red Strokes' business plan; (3) her negotiation with employees of music companies incorporated in Tennessee for the purpose of using music from two of Brooks' albums recorded in Nashville in two movies produced by Red Strokes: *Call Me Claus* (2001) and *Unanswered Prayers* (2010); (4) her several visits to Nashville in connection with Red Strokes' film project titled *The Lamb* in order to plan business strategy and participate in pre-release marketing; (5) her personal involvement in Red Strokes'

12

acquisition of the rights to *Sugar Blue*, a book written, in part, by a Nashville resident who also happened to be employed by a Tennessee music company; (6) her regular contact with O'Neil Hagaman, Red Strokes' Tennessee-based accountant who, among other things, handled the loan/gift that is at the center of this litigation; and (7) her use of a Tennessee music company to manage and administer the songwriting and music publishing credits she owns for the song *The Red Strokes*, which appears on two of Brooks' albums: *In Pieces* (1993) and *The Hits* (1995) (Docket No. 10 at 5-6; Docket No. 10, Ex. 1 ¶¶ 4, 6-7, 10-16.)

Having reviewed Sanderson's contacts with Tennessee, the court finds that it lacks a sufficient basis upon which to exercise general jurisdiction. Sanderson is for all intents and purposes a domiciliary of California, the state where she not only owns a home, but has lived and worked for over 25 years. *See United States v. Namey*, 364 F.3d 843, 845 (6th Cir. 2004) (stating that, "'[g]enerally, an individual's domicile is his true, fixed, and permanent home and principal establishment . . . [and] . . . is the place to which he returns whenever he is absent'") (*quoting Eastman v. Univ. of Mich.*, 30 F.3d 670, 672-73 (6th Cir. 1994)). Thus, California represents "the paradigm forum for the exercise of general jurisdiction" over Sanderson. *See Goodyear*, 131 S.Ct. at 2853 (stating that an individual's domicile is the "paradigm forum for the exercise of general jurisdiction" over that individual).

The Tennessee contacts identified by Red Strokes do not alter this conclusion. Again, while it is true that Red Strokes was a Tennessee corporation, the record shows that its office was located in California at all times relevant to this dispute and that Sanderson was based in that California office. Moreover, although Sanderson maintained regular and continuous contact with Brooks during the seven year period in which he resided in Nashville, and with O'Neil

13

Hagaman throughout the course of Red Strokes' corporate existence, such continuous activity, by itself, is not sufficient to support general jurisdiction. *See Goodyear*, 131 S.Ct. at 2856 ("A corporation's 'continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity") (*quoting Int'l Shoe*, 326 U.S. at 318). In addition, Sanderson's project-specific forum contacts arising from her employment involving negotiations with Tennessee companies for permission to use music in two films, promotional visits and activities in Nashville in association with a film project, and participation in acquiring rights to a book written, in part, by a Nashville resident are similarly insufficient to trigger general jurisdiction. Nor does Sanderson's use of a Tennessee music company to manage and administer her songwriting and music publishing credits provide a basis for general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418 (1984) (stating that "mere purchases [in the forum State], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general] jurisdiction over a nonresident corporation").

In sum, the record does not show that Sanderson's forum contacts were "so continuous and systematic as to render [her] essentially at home" in Tennessee. *Goodyear*, 131 S.Ct. at 2851. Indeed, the evidence shows that while Sanderson maintained contacts in Tennessee, her home base at all relevant times was in California. Accordingly, the court concludes that Red Strokes has failed to make a *prima facie* showing of general jurisdiction.

### C. Specific Jurisdiction

### 1) Purposeful Availment

14

The first prong of the three-part *Mohasco* test applied to determine whether a court may exercise specific jurisdiction analyzes whether there is purposeful availment. Indeed, before a defendant may be sued in a forum, the defendant "must purposefully avail" himself of the "privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (*quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958). This "requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, . . . or of the unilateral activity of another party or a third person." *Id.* (internal quotation marks and citations omitted).

Purposeful availment is "something akin to a deliberate undertaking to do or cause an act or thing to be done in [the forum state] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [the forum state], something more than a passive availment of [the forum state's] opportunities." *Bridgeport Music, Inc.*, 327 F.3d at 478 (internal quotation marks omitted). Purposeful availment exists "when the defendant's contacts with the forum state proximately result from actions by the defendant himself that create a substantial connection with the forum state, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Id.* (internal quotation marks omitted).

Sanderson contends that she conducted no business in Tennessee relevant to the issues underlying this case and that, accordingly, Red Strokes cannot demonstrate "purposeful availment." (Docket No. 3 at 10.) Again, while she acknowledges that Red Strokes is a Tennessee company, she relies on the fact that its office and employees, with the exception of

15

Brooks, were located in California at all times relevant to this dispute. (Docket No. 11 ¶ 3.) She also contends that virtually all of Red Strokes' business activities involving the development and production of film and television projects occurred in the Los Angeles area. (Docket No. 4 ¶ 5; Docket No. 11 ¶ 13.)

In response, Red Strokes contends that "purposeful availment" is established by the fact that Sanderson reached out to it, a Tennessee company, and obtained a loan,[13] which was issued from Nashville. (Docket No. 10 at 6-7.) It adds that the loan was issued to Sanderson only by virtue of her position as a General Manager of the company. (*Id.*) In further support of its "purposeful availment" argument, Red Strokes relies on Sanderson's approximately 17-year employment with the company and her contacts with Tennessee as a result of that employment. (*Id.* at 9.) Specifically, Red Strokes cites to many of the same contacts it previously asserted in support of its general jurisdiction argument. (*Id.* at 10.)

Red Strokes has demonstrated "purposeful availment" here. The record shows that Sanderson negotiated with Brooks to have Red Strokes, a Tennessee company, loan funds to pay for legal fees associated with her child custody dispute. (Docket No. 4 ¶¶ 7-10; Docket No. 10, Ex. 1 ¶ 17.) It further reveals that after completing these negotiations outside of Tennessee, Sanderson contacted O'Neil Hagaman, Red Strokes' Tennessee-based accountant who

---

[13] For the purposes of this motion, the court is to construe the facts presented in the light most favorable to the party asserting jurisdiction and not weigh or consider the conflicting facts presented by the other side. *Bird*, 289 F.3d at 871; *see also Estate of Thomson ex rel. Estate of Rakestraw*, 545 F.3d at 360-61. Red Strokes, the party asserting jurisdiction here, has alleged that the financial assistance it provided to Sanderson was a loan. Therefore, in analyzing Sanderson's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the court has adopted Red Strokes' characterization of the financial assistance. However, the court emphasizes that it has not prejudged whether the financial assistance provided by Red Strokes to Sanderson actually constituted a loan or, as Sanderson alleges, a gift.

16

administered the loan on its behalf, to have Red Strokes issue her a loan check. (Docket No. 10, Ex. 1 ¶¶ 16-17; Docket No. 11 ¶ 7.) The funds for this check were drawn from Red Strokes' SunTrust bank account in Nashville, Tennessee. (Docket No. 10, Ex. 1 ¶ 16.) At Sanderson's request, Red Strokes made subsequent loan disbursements to her attorneys. (*Id.* ¶ 18.) Indeed, upon receiving additional legal bills, Sanderson sent them to Ms. Harris at O'Neil Hagaman's office in Nashville before Red Strokes disbursed the loan funds through its Tennessee bank account. (*Id.* ¶ 18.) These facts demonstrate that Sanderson's contacts with Tennessee were not random, fortuitous, or attenuated, *Rudzewicz*, 471 U.S. at 475, but were instead the result of her own deliberate undertaking. *Bridgestone Music, Inc.*, 327 F.3d at 478. Moreover, Sanderson's subsequent default on the loan caused a consequence (namely, Red Strokes' alleged loss of the outstanding principal plus any interest) in Tennessee. *See Schneider*, 669 F.3d at 701.

Sanderson's employment as a General Manager for a Tennessee company over an approximately 17-year period also supports a finding of "purposeful availment." By virtue of her employment with Red Strokes, Sanderson continuously communicated with Brooks while he was living in Nashville to discuss various business matters and regularly contacted the company's Tennessee-based accountants throughout the course of Red Strokes' corporate existence. She also made visits to Nashville on company-related business and entered into business transactions with Tennessee entities and residents.

In sum, given the nature of her contacts with the forum, it would be entirely reasonable for Sanderson to "anticipate being haled into court" in Tennessee for a lawsuit predicated on her alleged default of the aforementioned loan and her alleged entitlement, by virtue of her employment with Red Strokes, to a production fee and either severance or retirement payments.

17

**2) Arising From**

The second prong of the *Mohasco* test requires that the plaintiff's cause of action arise from the defendant's contacts with the forum state. *Schneider*, 669 F.3d at 703. This prong is satisfied when the plaintiff's "causes of action are related to or connected with the defendant's contacts with the forum state." *Air Prods. and Controls, Inc.*, 503 F.3d at 553 (internal quotation marks omitted). The standard for satisfying this prong is a lenient one and a "cause of action need not formally arise from [the] defendant's contacts." *Id.* (internal quotation marks omitted).

This prong is plainly met here. In its lawsuit, Red Strokes brings causes of action for Sanderson's default of the loan and for a declaratory judgment stating that: (1) it does not have an employment contract with Sanderson; and (2) it does not owe her a production fee and either severance or retirement payments. Sanderson's contacts with Tennessee exist, in large part, by virtue of her employment with Red Strokes, a Tennessee company. Indeed, during the course of her employment with Red Strokes, she conducted business activities in Tennessee, negotiated the loan for her legal expenses, and communicated with the company's accountant in Tennessee to receive a series of loan disbursements paid from the company's Tennessee bank account. There can be no doubt that these contacts are related to or connected with the causes of action asserted here.

**3)       Reasonableness**

The third prong of the *Mohasco* test requires that the defendant "have a sufficiently substantial connection to the forum such that the exercise of jurisdiction is not unreasonable." *Schneider*, 669 F.3d at 703. "[W]here, as here, the first two criter[ia] are met, an inference of reasonableness arises and only the unusual case will not meet" the reasonableness prong of the

*Mohasco* test. *Id.* (internal quotation marks omitted). "In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the [controversy]." *Id.* at 703-04.

The contacts here are substantial enough to make the exercise of jurisdiction over Sanderson reasonable. The plaintiff, Red Strokes, is a Tennessee company and has a substantial interest in obtaining relief. Moreover, Tennessee has an interest in "in protecting its residents' legal options." *Youn*, 324 F.3d at 419. While the court recognizes that Sanderson may be burdened in defending a lawsuit in Tennessee, given her California residency and current unemployment, it notes that, where, as here, "minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the [non-resident] defendant." *Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cty.*, 480 U.S. 102, 114 (1987). Moreover, Sanderson assumed this burden by virtue of her employment with a Tennessee company and her specific contacts with the forum resulting from that employment, including her negotiation with Red Strokes for the loan at issue in this case and her direct requests to Red Strokes' Tennessee-based accountants for disbursements of that loan. *See CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1268 (6th Cir. 1996) ("It may be burdensome for [the defendant] to defend a suit in Ohio, but he knew when he entered into [business] with [the plaintiff] that he was making a connection with Ohio, and presumably he hoped that connection would work to his benefit."). Furthermore, while California may have an interest in adjudicating claims involving one of its residents who was

19

formerly employed at a foreign corporation's office located within its borders, "this interest does not override the other factors suggesting that personal jurisdiction in [Tennessee] is reasonable." *See Bird*, 289 F.3d at 876.

In sum, Sanderson has not shown that this is an "unusual case" requiring the court to cast aside the inference of reasonableness that already exists. Because Sanderson has failed to set forth any considerations that overcome that inference, the assertion of jurisdiction is reasonable under the circumstances of this case. Thus, as all three prongs of the *Mohasco* test have been satisfied, the court concludes that the exercise of personal jurisdiction over Sanderson in Tennessee accords with due process. Sanderson's motion to dismiss pursuant to Rule 12(b)(2) will be denied.

## II.     Motion to Dismiss for Improper Venue

Sanderson also moves to dismiss this action under Federal Rule of Civil Procedure 12(b)(3) for improper venue. In support of its assertion that venue is proper in this district, Red Strokes relies on 28 U.S.C. § 1391(a)(2), which states that a diversity action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(a)(2).[14] This section does not require the court to determine where the most substantial events giving rise to the claim occurred; rather venue is proper in "any forum with a substantial connection to the plaintiff's claim." *First of Mich. Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998).

---

[14] Congress amended 28 U.S.C. § 1391 on December 7, 2011, and the amended statute took effect on January 6, 2012. *See* Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, 125 Stat. 758. However, since this action was filed before January 6, 2012, the court will apply the prior version of the venue statute. In any event, the amendments to § 1391 do not affect the court's venue analysis.

The Sixth Circuit has yet to decide which party bears the burden when a court is faced with a Rule 12(b)(3) motion to dismiss. *Long John Silver's Inc. v. Diwa III, Inc.*, 650 F.Supp.2d 612, 630 (E.D. Ky. 2009). This issue is the subject of disagreement among district courts within the circuit. *Compare 513 Ventures, LLC v. PIV Enters., Inc.*, No. 1:11-cv-573, 2012 WL 995277 at *5 (S.D. Ohio Mar. 23, 2012) ("The plaintiff bears the burden of establishing proper venue after an objection to venue has been raised."), *and Receiver of the Assets of Mid-Am. Energy, Inc. v. Coffman*, 719 F.Supp.2d 884, 890 (M.D. Tenn. 2010) ("The burden of establishing venue falls on the plaintiffs"), *with Long John Silver's, Inc.*, 650 F.Supp.2d at 631 (concluding that the defendant bears the burden of establishing that the venue chosen by the plaintiff is improper), *and Kelly Servs. v. Eidnes*, 530 F.Supp.2d 940, 948 (E.D. Mich. 2008) (finding that the defendant holds the burden of establishing that venue is improper). Red Strokes urges the court to find that the burden of establishing improper venue should fall on the defendant. (Docket No. 10 at 12.) However, as one prominent authority on federal practice has noted, the position "that probably represents the weight of judicial authority, is that, when an objection has been raised, the burden is on the plaintiff to establish that the district he or she has chosen is a proper venue." 14D Charles Alan Wright, et al., *Federal Practice and Procedure*, § 3826 (3d ed. 2012). Therefore, the burden of establishing venue will fall on the plaintiff.

In reviewing a Rule 12(b)(3) motion to dismiss for improper venue, "the court may examine facts outside of the complaint but must draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Coffman*, 719 F.Supp.2d at 891 (internal quotation marks omitted). If the court determines that venue is improper, it must either dismiss the case or, if it is in the interest of justice, transfer it to a district where venue is proper. 28 U.S.C. § 1406.

21

In support of her motion to dismiss, Sanderson argues that the Middle District of Tennessee has virtually no connection to Red Strokes' claims. (Docket No. 3 at 14.) In particular, she argues that the alleged loan proceeds were paid on behalf of Sanderson in the Central District of California in connection with financial obligations she incurred within that district. (*Id.*) In response, Red Strokes argues that the Middle District of Tennessee has a substantial connection to its claims given Sanderson's employment with the company and her contacts with the forum as a result of that employment. (Docket No. 10 at 14.) The court agrees.

Again, the record shows that Sanderson: (1) obtained a loan[15] from Red Strokes, a Tennessee company; (2) subsequently contacted O'Neil Hagaman, the company's Nashville accountant who administered the loan, to have Red Strokes issue her a loan check; (3) sent additional loan requests with supporting documentation to O'Neil Hagaman in Nashville; and (4) received loan funds drawn on Red Strokes' SunTrust bank account in Nashville. Sanderson was also employed by a Tennessee company formed in Davison County and maintained contacts with this judicial district through her regular communications with Brooks and O'Neil Hagaman, visits to Nashville on company business, and business transactions with entities and residents based in Nashville. While, as Sanderson points out, this case certainly could have been brought

---

[15] For the purposes of this motion, the court is to "draw all reasonable inferences and resolve factual conflicts in favor of the plaintiff." *Coffman*, 719 F.Supp.2d at 891 (internal quotation marks omitted). The plaintiff here, Red Strokes, has alleged that the financial assistance it provided to Sanderson was a loan. Accordingly, in analyzing Sanderson's Rule 12(b)(3) motion to dismiss for improper venue, the court has adopted Red Strokes' characterization of the financial assistance. Yet, the court again emphasizes that it has not prejudged whether the financial assistance provided by Red Strokes to Sanderson actually constituted a loan or, as Sanderson alleges, a gift.

in the Central District of California,[16] the court's task here is not to find the district with the most substantial ties to the case but it is, rather, to determine whether the district chosen by the plaintiff has a substantial connection to the case. As the preceding record evidence demonstrates, this district has such a connection. Accordingly, Sanderson's Rule 12(b)(3) motion to dismiss for improper venue will be denied.

## III. Motion to Transfer

Alternatively, Sanderson moves the court to transfer this case to the Central District of California pursuant to 28 U.S.C. §§ 1404(a) and 1406(a). Since the court has already concluded that venue is proper in this judicial district, it need not consider Sanderson's motion to transfer under section 1406(a). *See* 28 U.S.C. § 1406(a) (providing for transfer only when a case is filed "laying venue in the wrong division or district"). As for Section 1404(a), it provides, in pertinent part, that, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). With this statute, "Congress intended to give district courts the discretion to transfer cases on an individual basis by considering convenience and fairness." *Kerobo v. Sw. Clean Fuels, Corp.*, 285 F.3d 531, 537 (6th Cir. 2002).

When considering a section 1404(a) motion to transfer, "a district court should consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice'." *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991). The Sixth Circuit has suggested that relevant factors to be

---

[16] Neither party disputes that Red Strokes could have brought this action in the Central District of California. (*See* Docket No. 3 at 13-15; Docket No. 10 at 12, n.4.)

considered include: (1) the convenience of the parties and witnesses; (2) the accessibility of evidence; (3) the availability of process to make reluctant witnesses testify; (4) the costs of obtaining willing witnesses; (5) the practical problems of trying the case most expeditiously and inexpensively; and (6) the interests of justice. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). Unless the balance of these factors strongly weighs in favor of the defendant seeking transfer, "the plaintiff's choice of forum should rarely be disturbed." *Id.* The defendant bears the burden of establishing that a transfer is warranted. *Pace Indus. Union-Mgmt. Pension Fund v. King Soopers, Inc.*, No. 3:11-cv-00148, 2011 WL 1481306, at *1 (M.D. Tenn. Apr. 18, 2011).

In support of her motion, Sanderson argues that: (1) virtually all of the non-party witnesses are located in the Central District of California and are beyond the subpoena power of this court; (2) the relevant documents and other evidence are located in the Central District of California and are more accessible there; (3) "all of the transactions and events giving rise to Red Strokes' alleged claims occurred in the Central District of California;" (4) she has lived and worked in the Central District of California for over 25 years and Red Strokes' office was located in that district at all times relevant to this suit; and (5) she is a person of limited financial means who has been unemployed since Red Strokes closed its Los Angeles-area office in 2010, whereas Red Strokes is owned by Garth Brooks, a country music legend and multi-millionaire. (Docket No. 3 at 20-21.)

The convenience of non-party witnesses "is often considered to be the most important factor when determining which forum is the most convenient." *King Soopers, Inc.*, 2011 WL 1481306, at *2 (internal quotation marks omitted). As to this factor, Red Strokes notes that "the party seeking the transfer must clearly specify the essential witnesses to be called and must make

a general statement of what their testimony will cover." *Smith v. Kyphon, Inc.*, 578 F.Supp.2d 954, 963 (M.D. Tenn. 2008) (citing 15 Charles Alan Wright, et al., *Federal Practice and Procedure* § 3851 (3d ed. 2012)). It further contends that, because Sanderson has only identified one specific witness by name, and has otherwise failed to detail what her witnesses testimony will cover, this convenience factor should weigh against transfer. (Docket No. 10 at 16.) In response, Sanderson submitted a supplemental declaration in which, among other things, she sought to provide additional details regarding the content of her anticipated witnesses' testimony.       In her supplemental declaration, Sanderson identified two witnesses who reside in the Central District of California: (1) Ms. Brazzell, the former Red Strokes Executive Assistant; and (2) certain unnamed attorneys at Wasser, Cooperman & Carter, the Los Angeles law firm which received payments from Red Strokes for the legal fees it incurred in connection with its representation of Sanderson in her child custody dispute. (Docket No. 4 ¶ 8-10; Docket No. 11 ¶¶ 3, 12.) Sanderson asserts that Brazzell has personal knowledge of whether Red Strokes' payment of Sanderson's legal fees was a gift, rather than a loan, because Brazzell participated in a conference call with Sanderson and Mr. Brooks in which this topic was discussed. (Docket No. 11 ¶ 12.) Sanderson also generally asserts that her former attorneys at Wasser, Cooperman & Carter will testify that they understood at all relevant times that Red Strokes' payment of Sanderson's legal fees was gratuitous. (*Id.*) The court does not share Red Strokes' view that Sanderson's failure to specifically identify her former attorneys by name is fatal, since she identified the specific firm where these attorneys worked. However, in her supplemental declaration, Sanderson fails to explain how she has personal knowledge of her attorneys' "understanding" that Red Strokes' payment of legal fees on her behalf was gratuitous. Nor does

she establish how her attorneys obtained this "understanding" themselves. As a result of these deficiencies, Sanderson lacks the foundation to describe the content of her attorneys' testimony. For its part, Red Strokes identifies one witness located in Nashville, Tennessee that it deems to be essential, Ms. Harris of O'Neil Hagaman. Red Strokes contends that Harris can testify about the details of the alleged loan it made to Sanderson.

In sum, each party has specifically identified one essential non-party witness who possesses relevant testimony. One resides in the Central District of California, while the other resides in this judicial district. Accordingly, the factor analyzing the convenience of non-party witnesses is neutral and does not support transfer to the Central District of California. Likewise, for the same reasons, the factor examining the availability of process to make such witnesses testify is similarly neutral.

With respect to the accessibility of evidence, Sanderson generally asserts that "the relevant documents and other evidence would be located in and more readily accessible in the Central District of California." (Docket No. 3, at 20; *see also* Docket No. 4 ¶ 16.) While it is reasonable to infer that some relevant evidence would exist in the Central District of California, since Red Strokes maintained its office in the Los Angeles area at all times relevant to this dispute, Sanderson fails to describe the contents or volume of that evidence, let alone any difficulty she would face in moving such evidence to the Middle District of Tennessee. Moreover, as Red Strokes contends, relevant evidence also exists in this district, as various company accounting documents, including payroll registers and the general ledger tracking the amounts Red Strokes allegedly loaned to Sanderson, are maintained by O'Neil Hagaman in Nashville. (Docket No. 10 at 16-17; Docket No. 10, Ex. 1 ¶¶ 3, 5, 18.) In addition, given the

26

advent of electronic discovery, and the relative ease in which documents can be transported, their location should generally play a neutral role in determining whether to transfer a case. *See Oakley v. Remy Int'l, Inc.*, No. 2:09-0107, 2010 WL 503125, at *5 (M.D. Tenn. Feb. 5, 2010) ("The Court recognizes that in the modern era of photocopying, scanning, fax machines, email, overnight delivery services, etc., the location of documents should be considered a neutral factor when deciding to transfer venue under § 1404(a)") (internal quotation marks omitted); *see also* 15 Charles Alan Wright, et al., *Federal Practice and Procedure* § 3853 (3d ed. 2012) ("However, since most records and documents now can be transported easily or exist in miniaturized or electronic form, especially, for example, the ubiquitous e-mail, their location is entitled to little weight."). Accordingly, the court finds that this factor does not favor transfer to the Central District of California.

"[T]he location of the events that gave rise to the dispute" is also a relevant factor to consider in evaluating the convenience of the parties. *Sovik v. Ducks Unlimited, Inc.*, No. 3-11-cv-0018, 2011 WL 1397970, at *5 (M.D. Tenn. April 13, 2011). Here, Sanderson asserts that "all of the transactions and events giving rise to Red Strokes' alleged claims occurred in the Central District of California." (Docket No. 3 at 20.) This conclusory assertion overstates matters and is without merit.

Again, in this suit, Red Strokes has sued Sanderson for her default of the alleged loan covering the legal expenses she incurred in connection with her child custody dispute. As to this claim, the record evidence shows that: (1) Sanderson, from the Central District of California, negotiated with Mr. Brooks, via telephone and in person, for Red Strokes to cover these legal expenses; and (2) these expenses were incurred in the Central District of California. However,

as Red Strokes points out, the record evidence also shows that the alleged loan had ties to this judicial district, since it was: (1) made by Red Strokes, a Tennessee company formed in Davidson County; (2) drawn from its Nashville bank account; and (3) administered by its Nashville-based accountant. In addition, Red Strokes also seeks a declaratory judgment stating that it does not have an employment contract with Sanderson and does not owe her a production fee and either severance or retirement payments. Neither party has addressed the specific events and transactions underlying the declaratory judgment action. Yet, at the very least, the employment relationship between the parties appears to implicate both this district and the Central District of California. Although Sanderson worked for Red Strokes in the Central District of California, where its office was based at all times relevant to this suit, it is also true that Red Strokes is a Tennessee company that retained a Nashville-based accountant to handle, among other things, its accounting, payroll, and employee benefits issues, and that Sanderson conducted some business activities in Nashville as a result of her employment. The court thus finds that this factor does not favor transfer.

Sanderson further argues that the convenience of the parties would be better served if this case were transferred because she has lived and worked in the Central District of California for over 25 years and Red Strokes' office was located in that district until 2010. (Docket No. 3, at 20; Docket No. 4 ¶¶ 2-4.) Red Strokes, however, is a Tennessee company that currently has no office or employees in California. (Docket No. 10, Ex. 1 ¶ 5.) It contends that, while transferring this case to the Central District of California may be more convenient for Sanderson, it is not more convenient for the parties as a whole. (Docket No. 10, at 17.) The court finds this factor to be neutral.

In a related argument, Sanderson contends that the disparity in the relative financial means and resources of the parties supports transfer to the Central District of California. (Docket No. 3, at 20-21.)  In particular, she contends that she is currently unemployed and has limited financial means, whereas Red Strokes is owned by Mr. Brooks, a country music legend and multi-millionaire.  (Docket No. 3, at 20-21; Docket No. 4 ¶ 16.)  Yet, with the exception of declaring that she is unemployed, Sanderson has failed to provide any details concerning her financial condition and has not otherwise explained why litigating this case in the Middle District of Tennessee would pose an undue financial burden.  This is despite the fact that Red Strokes argued in its opposition brief that Sanderson's alleged unemployment was not a sufficient reason to transfer the case.  (Docket No. 10 at 17.)  While Sanderson subsequently filed a supplemental declaration responding to other points raised in Red Strokes' opposition brief, she failed to provide any additional details concerning her financial condition.

Moreover, although Sanderson claims financial hardship, she has retained private counsel in both Los Angeles and Nashville to handle this matter.  Her Los Angeles-based counsel describes itself on its website as "one of the world's premier talent-side entertainment litigation firms." *Lavely & Singer - Profile*, http://www.lavelysinger.com/profile.html (last visited April 20, 2012).[17]  Sanderson has offered no evidence establishing that both sets of counsel are

---

[17] On its website, Sanderson's Los Angeles-based counsel also notes that it "represents a vast array of clients including a lion's share of Hollywood's most famous, celebrated and prestigious actors, producers, directors, writers, recording artists and other individuals and entities in and affiliated with the entertainment industry." *Lavely & Singer - Profile*, http://www.lavelysinger.com/profile.html (last visited April 20, 2012).  Sanderson's Nashville-based counsel also appears to maintain an entertainment law practice.  Indeed, an article in a local publication states that the recently-launched firm "will focus on transactional and litigation services for entertainment and sports clients as well as real estate, corporate, tax and estate planning."  Geert De Lombaerde, *Lassiter Tidwell Group Forms Entertainment Firm*, Nashville Post (June 15, 2011),

handling this matter on a *pro bono* basis.  In addition, despite Sanderson's assertions regarding

Red Strokes' purported financial means, there is no actual evidence in the record concerning the

company's financial position.  In light of all of this, the court cannot adequately gauge the

relative financial means and resources of the parties, let alone conclude that Sanderson's

financial condition favors transfer to the Central District of California.

Having considered each of Sanderson's arguments, the court concludes that she has

failed to sustain her burden of establishing that a transfer is warranted.  Indeed, because the

balance of relevant factors[18] does not strongly weigh in Sanderson's favor, Red Strokes' choice

of forum will not be disturbed.  *Reese*, 574 F.3d at 320.  Accordingly, Sanderson's motion to

transfer this case to the Central District of California will be denied.

## CONCLUSION

For all of the reasons discussed herein, the Motion to Dismiss or Transfer (Docket No. 2)

and the Plaintiff's Motion to Strike (Docket No. 13) will be denied.

---

http://nashvillepost.com/blogs/postbusiness/2011/6/15/lassiter_tidwell_group_forms_entertainm
ent_firm.

    [18] In their briefing, neither party specifically addressed the following factors: (1) the costs
of obtaining willing witnesses; (2) the practical problems of trying the case most expeditiously
and inexpensively; and (3) the interests of justice.  *Reese*, 574 F.3d at 320.  However, to the
extent that they are relevant here, the court finds, based on the record before it, no reason why
any of these factors strongly favors transfer to the Central District of California.

30

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

Case 3:12-cv-00008   Document 18   Filed 05/01/12   Page 31 of 31 PageID #: 215