**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RED STROKES ENTERTAINMENT, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:12-cv-0008** |
| | ) | **Judge Trauger** |
| **v.** | ) | |
| | ) | |
| **LISA A. SANDERSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Defendant Lisa A. Sanderson has filed a Motion for Summary Judgment (Docket No.

42), to which the plaintiff, Red Strokes Entertainment, Inc. ("Red Strokes"), filed a Response in

opposition (Docket No. 51), and Sanderson has submitted a Reply (Docket No. 56). Sanderson

has also filed a Request for Judicial Notice (Docket No. 44) and several "Objections" related to

the admissibility of certain evidence (Docket No. 56, Ex. 1), to which Red Strokes has filed

Responses in opposition (Docket No. 64). For the reasons stated herein, Sanderson's Objections

will be overruled in part, and Sanderson's Motion for Summary Judgment will be denied.

**OVERVIEW[1]**

---

[1] Unless otherwise noted, the facts are drawn from the defendant's statement of material facts
(Docket No. 43), the plaintiff's responses thereto (Docket No. 53), the plaintiff's statement of
additional material facts (Docket No. 52), the defendant's responses thereto (Docket No. 56, Ex.
2), and the exhibits filed in support of the parties' briefs (Docket Nos. 45-48, 51-53). The court
draws all reasonable inferences in favor of the non-moving party—here, Red Strokes.
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United
States*, 583 F.3d 916, 919 (6th Cir. 2009).

Red Strokes is an entertainment production company that was intended to facilitate musician Garth Brooks' film career. The company was formed in 1994 in Nashville, TN, where it currently maintains an office. Sanderson was the company's General Manager from approximately 1993 until 2011. Sanderson and Brooks were also close friends during her employment with Red Strokes. During the time that she worked for Red Strokes, Sanderson resided in California, where she still lives.

This case involves an acrimonious financial dispute between Red Strokes and Sanderson. From approximately 2005 to 2007, Sanderson was involved in litigation related to a personal problem. It is undisputed that she confided in Brooks about that litigation. It is also undisputed that, at some point in time, in some manner of communication, and at some unknown place, an oral agreement was made between Brooks and Sanderson related to her legal fees for that litigation (the "Legal Fees Loan").[2]

Red Strokes alleges that the oral agreement was a loan agreement and, specifically, that Brooks set forth that Red Strokes would loan Sanderson the money to pay her legal fees with the understanding that 100% of the loan would be repaid to Red Strokes when Sanderson was able to do so. According to Red Strokes, the first loan amounted to a principal of $223,738.21. Sanderson opposes Red Strokes' allegations and argues that the oral agreement between herself

_____

[2] The primary factual dispute between the parties is whether the money that Red Strokes (through its accountant) sent to Sanderson and her attorneys and paid to the State of California was a gift or a loan, the latter of which would have to be repaid to Red Strokes. Sanderson repeatedly objects to the categorization of the exchanges between the parties as "loans." Viewing the facts in the light most favorable to Red Strokes, for purposes of this memorandum, the court will refer to the money sent to Sanderson and her attorneys by Red Strokes and paid to the State of California as, respectively, the Legal Fees Loan and the Tax Loan.

and Brooks provided that Red Strokes would give Sanderson the money to pay her legal fees as a gift.

Red Strokes also alleges that it loaned Sanderson $2,399.61 to satisfy various California tax liens (the "Tax Loan"). Red Strokes avers that Sanderson failed to repay Red Strokes and therefore defaulted on the loans. Sanderson argues that she does not owe Red Strokes any money related to these tax withholding orders and that she was unaware of any tax payment made on her behalf to the State of California.

Red Strokes seeks to recover the amounts it is owed, in addition to pre-and post-judgment interest, reasonable attorney's fees, and costs. Red Strokes also seeks a declaratory judgment that (1) no employment contract existed between Red Strokes and Sanderson, and (2) Red Strokes does not owe any money—production fees or otherwise—to Sanderson. On April 15, 2013, during the pendency of this action, Sanderson filed a Complaint against Brooks and Red Strokes in the Superior Court for California in Los Angeles County. *See Lisa A. Sanderson v. Garth Brooks and Red Strokes Entertainment, Inc., et al.*, Los Angeles County, California, Superior Court Case No. BC505548 (Docket No. 44; Docket No. 44, Ex. 1) (the "California Action"). According to Red Strokes' Complaint and Sanderson's Complaint in the California Action, Sanderson claims that she is entitled to a production fee and either a severance or retirement payment from Red Strokes.

Sanderson has moved for summary judgment, contending that California's statute of limitations for loan agreements bars Red Strokes' claims, that the terms of the alleged loans between the parties are too vague to be enforced, and that, because of the pending California Action, the court should abstain from exercising jurisdiction over Red Strokes' declaratory relief

claims.  In support of her motion, Sanderson submitted only one testimonial affidavit—her own.[3]

In opposition, Red Strokes submitted affidavits from Red Strokes' accountants at O'Neil

Hagaman, PLLC ("O'Neil Hagaman").  Sanderson has filed substantial Objections to the two

affidavits submitted by Red Strokes.  The court addresses these Objections before assessing the

merits of Sanderson's Motion for Summary Judgment.

## NOTICES OF OBJECTION

### I.    Overview

In its brief opposing the Motion for Summary Judgment, Red Strokes relies on various

discovery materials, including the Harris Affidavit and the Dennis Affidavit (and exhibits

attached thereto).  Sanderson filed copious Objections in relation to these affidavits and exhibits,

objecting to nearly every paragraph of the Harris Affidavit and all but two exhibits attached

thereto.[4]  The standard for admissibility is the same at this stage as at trial.  *See Anderson v.*

---

[3] With respect to Sanderson's motion, the parties have filed supporting documents.  In support of
her Motion, Sanderson has filed a Memorandum of Law (Docket No. 42, Ex. 1), the Declaration
of Lisa A. Sanderson (Docket No. 45), the Declaration of Allison S. Hart (Docket No. 46), and a
Statement of Undisputed Material Facts (Docket No. 43) ("Sanderson's SUMF").  The
Declaration of Allison Hart ("Hart Declaration") attaches an excerpt of Red Strokes' Responses
to Sanderson's First Set of Interrogatories, Requests for Production of Documents, and Requests
for Admission, which appear to match the documents submitted by Red Strokes in support of its
Response in Opposition.  (*Compare* Docket No. 46 *with* Docket No. 51, Exs. 3-4.)  In support of
its Response in Opposition to Sanderson's Motion, Red Strokes has filed a Response to
Sanderson's SUMF (Docket No. 53) and a Statement of Additional Material Facts (Docket No.
52) ("Red Strokes' SUMF"), the Affidavit of Cheryl S. Harris ("Harris Affidavit") (Docket No.
51, Ex. 3), and the Affidavit of Dana Dennis ("Dennis Affidavit") (Docket No. 51, Ex. 4).

[4] Of 33 paragraphs in the Harris Affidavit, Sanderson objects to 24.  Of 19 exhibits attached to
the Harris Affidavit, Sanderson objects to 17.  Sanderson also objects to both of the exhibits
attached to the Dennis Affidavit, which are identical to two exhibits attached to the Harris
Affidavit.  The voluminous unfocused objections offered by Sanderson are not well taken.  In

*Liberty Lobby, Inc.* 477 U.S. 242, 250 (1986) (to survive a Rule 56 motion, plaintiff must "must come forward with affidavits or other admissible evidence"); *see also* Fed. R. Civ. P. 56(c)(4) (affidavits must, *inter alia*, "set out facts that would be admissible in evidence"). The court will only consider objections at this stage necessary to decide the instant motion (the "Certain Objections").[5]

## II.  <u>Certain Objections</u>

The court's findings on the Certain Objections are outlined below.

### A.  The Harris Affidavit

- <u>Paragraphs 6-8, 19.</u>  Sanderson's objections to Paragraphs 6-8 and Paragraph 19 are overruled.  Harris, in her management role at O'Neil Hagaman and as Red Strokes' accountant, possesses personal knowledge regarding the services that she and her colleagues performed on behalf of Red Strokes.  Harris' sworn testimony in Paragraphs 6-8 and 19 is directly drawn from her personal knowledge of the administration of Red Strokes' financial affairs, including its payroll and its bank accounts.  Sanderson's objection as to Harris' personal knowledge is unsubstantiated; Sanderson has not submitted any testimony or documentary evidence that suggests that Harris did not perform the role and services for Red Strokes that she attests to have performed.  To the extent that Sanderson objects to the Harris Affidavit's categorization of the transactions at issue as "loans," the court admits the relevant statements for the limited and undisputed purpose that Red Strokes' accountant, O'Neil Hagaman, used the term "loan" internally to describe the Legal Fees Loan and related subsequent transactions.

- <u>Exhibit A.</u>  Sanderson's authentication objection as to Exhibit A, the Red Strokes Ledger Report dated 01-01-68 through 12-31-11, is overruled.  The document is authenticated by the Harris Affidavit under Federal Rules of Evidence 901(a) and 902(11) (for certified domestic records of regularly conducted activity).  In her

particular, Sanderson's repetitive objections as to authentication, personal knowledge, and relevancy border on spurious.

[5] In ruling on the Certain Objections at this stage, the court intends its rulings to have preclusive effect in this case.  Therefore, the court expects that the parties will not file motions *in limine* that retread evidentiary objections addressed in this opinion.  For all remaining objections, the court postpones its decision, and both parties will have to file proper motions *in limine* in accordance with the pretrial schedule.

affidavit, Harris sufficiently authenticates the documents by attesting that the document is a true and correct copy of the ledger. Fed. R. Evid. 901(a). Harris further attests that her firm maintained the ledger in the ordinary course of business and that its entries were regularly and contemporaneously updated by O'Neil Hagaman. Such a record is self-authenticating pursuant to Fed. R. Evid. 902(11).

- Paragraphs 10, 14. Sanderson objects to Paragraphs 10 and 14 as hearsay and on the basis of the best evidence rule. Her objections are overruled. Paragraphs 10 and 14 include Harris' testimony describing (1) a phone conversation between Harris and Sanderson discussing the loan, and (2) an email that she received from Sanderson related to the loan. Because Sanderson is a party to this action, Paragraphs 10 and 14 are admissible as non-hearsay pursuant to Fed. R. Evid. 801(d)(2). *See United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (noting that Rule 801(d)(2) excludes admissions by a party-opponent from the definition of hearsay "because the adversarial process allows the party-declarant to rebut his or her own admissions by testifying at trial."). The court also overrules Sanderson's objection to Paragraphs 10 and 14 pursuant to the best evidence rule. Because Harris is testifying regarding her first-hand knowledge of a conversation with Ms. Sanderson, the best evidence rule is inapplicable. *See Jackim v. Sam's East, Inc.*, 378 Fed. App'x 556, 565-66 (6th Cir. 2010) (evidence in the form of an affidavit of someone with personal knowledge that was "germane to what transpired" may be properly considered).

- Exhibits E-F, S. Exhibits E-F are emails sent from Sanderson at the email address RSPRODUCER@aol.com to Harris and then forwarded by Harris to Dana Dennis. Exhibit F was also forwarded by Dennis to another O'Neil Hagaman employee, Lynette Young. Exhibit S is a reply email authored by Sanderson, responding to an email sent to Sanderson by Dana Dennis (Exhibit R). Sanderson's objections to Exhibits E-F and S are overruled. First, in her affidavit, Harris sufficiently authenticates the documents by attesting that the documents are true and correct copies of emails sent by Sanderson[6] and received by Harris. Fed. R. Evid. 901(a). Second, because Sanderson is a party to this action, the emails are admissions by a party-opponent and admissible under Fed. R. Evid. 801(d)(2).

---

[6] Sanderson's objection as to the identity of the sender with email address RSPRODUCER@aol.com is unsubstantiated and borders on frivolity. The email address indicates an affiliation with Red Strokes, and the email is signed "Lisa" with the Red Strokes' company address in the signature block. If Sanderson chooses to pursue similar objections in her motions *in limine*, she must submit an affidavit supporting her objection and denying she ever utilized the email address RSPRODUCER@aol.com. (*See* Docket No. 56, Ex. 1 (objecting to Harris' authentication of an email to LISASANDERSON7@aol.com in Paragraph 21 of the Harris Affidavit).)

Third, the emails from Sanderson to Harris are highly relevant, as they reflect the course of transactions between Sanderson and Red Strokes. Finally, the court overrules Sanderson's Rule 403 Objection. Rule 403 does not deem "prejudicial" otherwise admissible evidence solely on the basis that it is unflattering to Sanderson or contradicts her own testimony.

- <u>Exhibits H-I.</u> Exhibits H and I are emails with attachments (Exs. J-K, addressed below) sent by Harris to Sanderson regarding loan schedules prepared by Harris. Sanderson's relevancy, authentication, and prejudice objections are overruled. First, in her affidavit, Harris sufficiently authenticates the documents by attesting that both documents are true and correct copies of emails sent to Sanderson and authored by Harris. Fed. R. Evid. 901(a). Second, the emails from Harris to Sanderson are highly relevant, as they reflect the course of transactions between Sanderson and Red Strokes. Third, the court overrules Sanderson's Rule 403 objection. Rule 403 does not deem "prejudicial" otherwise admissible evidence solely on the basis that it is unflattering to Sanderson or contradicts her own testimony. The court postpones any ruling on Sanderson's hearsay objection to Exs. H-I, but admits the documents for the limited purpose of demonstrating that Sanderson was on notice that O'Neil Hagaman was referring to the transaction as a "loan" and had prepared "schedules" related to the "loan history."

- <u>Paragraph 15.</u> Sanderson's objections to Paragraph 15 are overruled. Harris, in her management role at O'Neil Hagaman and as Red Strokes' accountant, possesses personal knowledge regarding the services that she and her colleagues, including Dana Dennis, performed on behalf of Red Strokes. Harris' sworn testimony in Paragraph 15 is directly drawn from her personal knowledge of the administration of Red Strokes' financial affairs, including its payroll and its bank accounts. Sanderson's objection as to Harris' personal knowledge is unsubstantiated; she has not submitted any testimony or documentary evidence that suggests that Harris did not perform the role and services for Red Strokes that she attests to have performed. The court also overrules Sanderson's best evidence rule objection to Paragraph 15. Because Harris is testifying regarding her first-hand knowledge of a conversation with Ms. Sanderson, the best evidence rule is inapplicable. *See Jackim*, 378 Fed. App'x at 565-66.

- <u>Paragraphs 18-21.</u> Sanderson's objections to Paragraph 18-20 are overruled. Harris has personal knowledge of the email that she sent to Sanderson as the author of the email and documents, and her attestation to the validity of the email is sufficient to show foundation. The court also overrules Sanderson's objections to Paragraphs 18-21 pursuant to the best evidence rule. Because Harris is testifying regarding her first-hand knowledge of a conversation with Ms. Sanderson, the best evidence rule is inapplicable. *See Jackim*, 378 Fed. App'x at 565-66. The court postpones any ruling on Sanderson's hearsay objection to Paragraphs 18-21, but admits the testimony for the limited purpose of demonstrating that Sanderson was on notice that O'Neil Hagaman was referring

to the transaction as a "loan" and had prepared "schedules" related to the "loan history."  To the extent that Sanderson objects to the Harris Affidavit's categorization of the transactions at issue as "loans," the court admits the relevant statements for the limited and undisputed purpose that Red Strokes' accountant, O'Neil Hagaman, used the term "loan" to describe the Legal Fees Loan and related subsequent transactions.  Paragraphs 18-21 are relevant and not prejudicial.  Finally, as to Sanderson's objection to Paragraph 21 regarding Sanderson's receipt of the email and loan schedule, the court declines to rule because Sanderson's receipt is unnecessary in light of the existing genuine issues of material fact and the court's denial of her summary judgment motion.

- <u>Exhibits J-K.</u>  Exhibits J-K are attachments sent to the email address RSPRODUCER@aol.com by Harris.  Sanderson's objections to Exhibits J-K are overruled.  First, in her affidavit, Harris sufficiently authenticates the documents by attesting that the document is a true and correct copy of a document that she authored and maintained throughout the relevant period.  Fed. R. Evid. 901(a).  Second, the emails are business records pursuant to Fed. R. Evid. 803(6) and therefore are not excluded by the hearsay rule.  Third, the documents are relevant as they reflect the course of transactions between Sanderson and Red Strokes.  Finally, the court overrules Sanderson's Rule 403 Objection.  Rule 403 does not deem "prejudicial" otherwise admissible evidence solely on the basis that it is unflattering to Sanderson or contradicts her own testimony.

- <u>Exhibits P and R.</u>  Exhibit P is an email sent by Harris to Lisa Sanderson at the email address lisa@sandersonentertainment.com, copying Dana Dennis.  Exhibit R is an email sent by Dennis to Sanderson, copying Cheryl Harris.  Sanderson's objections are overruled.  First, in her affidavit, Harris sufficiently authenticates the documents by attesting that Exhibit P is a true and correct copy of an email authored by her and sent to Sanderson and that Exhibit R is a true and correct copy of an email authored by her subordinate at her direction and sent to Sanderson, copying Harris.  Fed. R. Evid. 901(a).  Second, the emails are admitted for the non-hearsay purpose of demonstrating notice.  The emails show that O'Neil Hagaman, Red Strokes' accountant, sent notice to Sanderson regarding the tax withholding orders from the State of California.  Third, the emails are highly relevant, as they reflect the course of transactions between Sanderson and Red Strokes.  Finally, the court overrules Sanderson's Rule 403 Objection.  Rule 403 does not deem "prejudicial" otherwise admissible evidence solely on the basis that it is unflattering to Sanderson or contradicts her own testimony.

- <u>Paragraph 28, 30-32.</u>  Sanderson's objection to Paragraphs 28 and 30-32 of the Harris Declaration are overruled.  Harris, in her management role at O'Neil Hagaman and as Red Strokes' accountant, possesses personal knowledge regarding the services that she and her colleagues performed on behalf of Red Strokes.  Harris' sworn testimony in Paragraphs 28 and 30-32 is directly drawn

from her personal knowledge of the administration of Red Strokes' financial affairs, including its payroll and its bank accounts. Sanderson's objection as to Harris' personal knowledge is unsubstantiated; she has not submitted any testimony or documentary evidence that suggests that Harris did not perform the role and services for Red Strokes that she attests to have performed. To the extent that Sanderson objects to the Harris Affidavit's categorization of the transactions at issue as "loans," the court admits the relevant statements for the limited and undisputed purpose that Red Strokes' accountant, O'Neil Hagaman, used the term "loan" internally to describe the Legal Fees Loan, the Tax Loan, and related subsequent transactions. Third, Harris' testimony about the tax withholding order and the accounting firm's treatment of its costs is highly relevant, as it reflects the course of transactions between Sanderson and Red Strokes. Finally, the court overrules Sanderson's Rule 403 objection. Rule 403 does not deem "prejudicial" otherwise admissible evidence solely on the basis that it is unflattering to Sanderson or contradicts her own testimony.

- <u>Paragraph 33.</u> Sanderson's objection to Paragraph 33 of the Harris Declaration is overruled. Harris, in her management role at O'Neil Hagaman and as Red Strokes' accountant, possesses personal knowledge regarding the services that she and her colleagues performed on behalf of Red Strokes. Harris' sworn testimony in Paragraph 33 of her Affidavit is directly drawn from her personal knowledge of the administration of Red Strokes' financial affairs, including its payroll and its bank accounts. Sanderson's objection as to Harris' personal knowledge is unsubstantiated; she has not submitted any testimony or documentary evidence that suggests that Harris did not perform the role and services for Red Strokes that she attests to have performed. To the extent that Sanderson objects to the Harris Affidavit's categorization of the transactions at issue as "loans," the court admits the relevant statements for the limited and undisputed purpose that Red Strokes' accountant, O'Neil Hagaman, used the term "loan" internally to describe the Legal Fees Loan, the Tax Loan and related transactions. Third, Harris' testimony about the tax withholding order and the steps taken by Red Strokes to remit the tax fees is highly relevant, as it reflects the course of transactions between Sanderson and Red Strokes. The court overrules Sanderson's Rule 403 objection. Rule 403 does not deem "prejudicial" otherwise admissible evidence solely on the basis that it is unflattering to Sanderson or contradicts her own testimony. Finally, the court overrules Sanderson's hearsay objection because Harris, testifying to Sanderson's silence, is testifying as to Sanderson's failure to express concern to her and O'Neil Hagaman as an adoptive admission.

## B. The Dennis Affidavit

- <u>Exhibit A.</u> Sanderson objects to Exhibit A to the Dennis Affidavit, an email chain including an email authored by Dennis and sent to Sanderson and a reply thereto sent by lisa@sandersonentertainment.com to Dennis, copying Cheryl Harris. The email is a copy of Exhibit S to the Sanderson Affidavit. Sanderson's objections to

Exhibit A are overruled. First, in their affidavits, Dennis and Harris sufficiently authenticate the communications by attesting that the documents are true and correct copies of emails sent to/by Sanderson and received to/by Dennis (and Harris). Fed. R. Evid. 901(a). Second, the Sanderson reply email is an admission by a party-opponent and admissible under Fed. R. Evid. 801(d)(2). Third, the emails among Dennis, Sanderson, and Harris are highly relevant, as they reflect the course of transactions between Sanderson and Red Strokes. Finally, the court overrules Sanderson's Rule 403 objection. Rule 403 does not deem "prejudicial" otherwise admissible evidence solely on the basis that it is unflattering to Sanderson or contradicts her own testimony.

- Paragraph 6. Sanderson's objections to Paragraph 6 of the Dennis Affidavit are overruled. Dennis, in her role at O'Neil Hagaman and as a member of Red Strokes' accounting team, possesses personal knowledge regarding the services that she and her colleagues performed on behalf of Red Strokes. Dennis' sworn testimony in Paragraph 6 of her Affidavit is directly drawn from her personal knowledge of the administration of Red Strokes' financial affairs, including its payroll and its bank accounts. Sanderson's objection as to Dennis' personal knowledge is unsubstantiated; she has not submitted any testimony or documentary evidence that suggests that Dennis did not perform the role and services for Red Strokes that she attests to have performed. To the extent that Sanderson objects to the Dennis Affidavit's categorization of the transactions at issue as "loans," the court admits the relevant statements for the limited and undisputed purpose that Red Strokes' accountant, O'Neil Hagaman, used the term "loan" internally to describe the Tax Loan and related transactions. Third, Dennis' testimony about the tax withholding order and the steps taken by Red Strokes to remit the tax fees is highly relevant, as it reflects the course of transactions between Sanderson and Red Strokes. Finally, the court overrules Sanderson's Rule 403 objection. Rule 403 does not deem "prejudicial" otherwise admissible evidence solely on the basis that it is unflattering to Sanderson or contradicts her own testimony.

With the Certain Objections resolved, the court will now assess the merits of Sanderson's

Motion for Summary Judgment.

## ADDITIONAL FACTS AND PROCEDURAL BACKGROUND

### I.    The Legal Fees Offer and Loan

#### A.  Sanderson's First-Hand Account

It appears to be undisputed that, at some point in time prior to or on November 1, 2005,

Brooks and Sanderson discussed Sanderson's personal legal difficulties. (Docket No. 45; Docket

No. 51, Ex. 3 ¶ 7.)  The conversation that took place is scantily described in the record, and the only first-hand account is set forth in Sanderson's Affidavit.[7]  Sanderson states that "Mr. Brooks expressed to [her] that he wanted to ensure that she had the best possible legal representation and told her that he would pay the legal fees incurred in that matter as a gift to [her]."  (Docket No. 45 ¶ 5.)  She further states that she accepted Brooks' offer and that, subsequently, "[f]rom approximately November 2005 through January 2007, Mr. Brooks arranged for Red Strokes to pay my legal fees directly to my attorneys, who were located in Los Angeles, California."  (*Id.* ¶ 6.)  Sanderson offers no details regarding the circumstances of this conversation.  She does not testify about when or where the conversation took place, nor does she describe if the conversation took place in person or over the phone.  She similarly fails to provide any written memorialization matching her account of the conversation, either contemporaneous with or subsequent to the agreement's formation.  Sanderson unequivocally submits that, "[a]t no time did Mr. Brooks ever state that I would ever be expected to repay Red Strokes or him personally for the legal fees that were paid on my behalf" and, instead, that Brooks repeatedly told her "never to think" about repaying the loan.  (Docket No. 45 ¶ 8.)  As with her description of the initial conversation about the Legal Fees Loan, Sanderson does not identify the time, place, or method by which Brooks allegedly reassured her of the nature of the payments as a gift.

---

[7] Brooks—the only individual besides Sanderson who can testify with personal knowledge about the oral agreement at issue—has not submitted any testimony in response to Sanderson's Motion for Summary Judgment.  For that matter, neither party has filed deposition testimony from any party or witness.  The parties rely on a sparse record that consists of only Sanderson's self-serving affidavit and the accountants' sworn statements.

Sanderson further avers that, "[p]rior to filing this lawsuit, neither Mr. Brooks nor Red Strokes" ever (1) "demanded that [Sanderson] repay Red Strokes for its payment [of her legal fees];" or (2) "discussed any repayment terms with Sanderson." (*Id.* ¶ 11.)

## B. O'Neil Hagaman and the Legal Fees Loan Transactions

Red Strokes has filed two affidavits in support of its opposition to Sanderson's motion. These affidavits, from two different members of Red Strokes' accounting firm, O'Neil Hagaman, describe the transactions related to the Legal Fees Loan that took place after the conversation between Brooks (on behalf of Red Strokes) and Sanderson. The affidavits also recite the accounting firm's and Sanderson's actions related to the Tax Loan.

Cheryl Harris, a member of O'Neil Hagaman, testified that her firm was engaged to provide accounting services to Red Strokes in 1994. Her work for Red Strokes included managing all accounting and tax responsibilities including, among others, "general ledger maintenance, preparation of federal and state income tax returns," and "accounts payable, payroll, [and] cash receipts." It is undisputed that Harris worked closely with Sanderson in Sanderson's role as Red Strokes' General Manager.

Harris attests that she and her colleagues "facilitated" the payments sent from Red Strokes' bank account to Sanderson related to the Legal Fees Loan. She states that the initial loan payment in November 2005 was made directly to Sanderson, and subsequent payments were made directly to Sanderson's attorneys at her request. (Docket No. 2 at ¶¶ 6-8.) Harris and her colleagues recorded these payments in a ledger (the "Ledger") designated for Red Strokes' loans to Sanderson. (Docket No. 51, Ex. 3, ¶¶ 6-8; *see id.*, Ex. A.) The Ledger reflects debits made to Sanderson and Wasser, Cooperman & Carter (Sanderson's attorneys) between November 3, 2005 and January 23, 2007. (*Id.*, Ex. A) For the year 2005, the Ledger also

calculates an interest balance amounting to $113.35. (*Id.*) As of January 23, 2007, the Ledger's

closing balance amounted to $223,738.21. (*Id.*) The next entry on the Ledger is dated over four

years later, May 13, 2011. (*Id.*) The Ledger includes credit entries attributed to Lisa Sanderson

from May 13, 2011 through October 14, 2011, and its closing balance is $185,361.69.[8] (*Id.*)

 Harris testifies that, contrary to Sanderson's testimony, she and Sanderson discussed the

Legal Fees Loan and that "Ms. Sanderson expressed that the payments from Red Strokes to

herself was a loan that she would repay when she was able." (*Id.* ¶ 10.) Harris further attests

that, on December 1, 2005, Sanderson emailed Harris to request another installment of the Legal

Fees Loan. (*Id.* ¶ 14; *see also id.*, Ex. E.) Sanderson's email included the law firm's address,

indicating that Harris should mail the check directly to her attorneys, and explained that the

current amount due "is $17,143.06." (*Id.*, Ex. E.) The December 1, 2005 email from Sanderson

to Harris explains the amount owed and refers to the first installment of the loan:

> Please note: The bill I am forwarding to you reflects the amount of
> $41,472.10, disregard that amount as the current amount due is
> $17,143.06. The previous balance was $24,329.04 plus $2500.00
> paid to a Dr. Lulow that they have involved . . . which was a
> separate check I had to write on the spot, I had temporarily
> borrowed that amount along with the previous amount due . . .
> which gave us the previous total of $30.972.47.

(*Id.*, Ex. E.) Later that day, Harris forwarded Sanderson's December 1, 2005 email to her

colleague at O'Neil Hagaman, Dana Dennis, and asked Dennis to issue and mail a check. On

December 2, 2005, Dennis forwarded the email chain to another colleague, Lynette Young, and

noted that she believed the amount was "from Red Strokes and coded to Lisa's loan." (*Id.*, Ex.

F.)

---

[8] It appears from the face of the document that the Ledger was closed on November 2, 2011.

Harris states that, on September 6, 2007, after Sanderson's legal proceedings had ended, Harris "sent an email to Sanderson with the subject line 'loan history' and asked if Ms. Sanderson would rather [that Harris] email or mail the loan schedules to her." (*Id.* ¶ 18; *see also id.*, Ex. H.) The next day, Harris emailed Sanderson and announced that she had attached two loan schedules: one, "all legal," and the second relating to "previous credit card activity." The email attached two spreadsheets: the first titled "Lisa – Loan Receivable.XLS" and the second, "lspersonal.xls." (*Id.*, Exs. I, J, K; *id.* ¶ 19.) Harris attests that, upon receipt of the email and loan schedules, Sanderson "did not express surprise, ask for clarification, or otherwise dispute (1) the total amount she owed or (2) the fact that the payments from Red Strokes to Ms. Sanderson and her attorneys were clearly a loan." (*Id.* ¶ 21.)

Red Strokes alleges that, in January 2011, as part of the loan repayment process, Ms. Sanderson agreed that she would repay the Legal Fees Loan through withholding from her paycheck. (*Id.*, Ex. K.) It appears from the Ledger that, in May 2011, Red Strokes began to withhold the entirety of Sanderson's paycheck and direct the money towards repayment of the loan. (*Id.*, Ex. A.) Harris avers that Sanderson did not express "any alleged confusion or doubts" about the status of the payments as a loan until "after she had begun repaying the loan through paycheck reductions." (*Id.*) For her part, Sanderson maintains that she was not aware that the Legal Fees Loan would be treated as a "loan"—that Red Strokes never "demanded" that she repay the loan or discussed repayment terms with her—until the filing of this lawsuit and service of the Complaint on December 6, 2011. (Docket No. 45 ¶ 11; Docket No. 1 ¶ 2.)

## II.     <u>The Tax Loan</u>

On May 31, 2011, Harris forwarded Sanderson a Personal Income Tax Earnings Withholding Order for Taxes from the State of California Franchise Tax Board ("May

Withholding Order") (Docket No. 51, Ex. 3, Exs. O-P; *see id.* ¶¶ 27-28).  The May Withholding Order, dated May 20, 2011, was intended "to collect a delinquent tax debt owed by the [named] employee," Lisa Sanderson.  The order states that the amount due is $1,591.49.  The order instructs Sanderson's employer, Red Strokes, to take certain steps to comply with the order: (1) to deliver certain pages of the order to the employee within 10 days of receipt; (2) to calculate a withholding amount using an included chart; (3) to complete and return an "employer's acknowledgement" form; (4) to begin withholding from employee's earnings; and (5) to send the amount withheld to the Franchise Tax Board.  (*Id.*, Exs. O-P.)

Harris attests that Red Strokes used the withholding chart to calculate a withholding amount of $925.21 from Sanderson's May 31, 2011 paycheck and $666.28 from Sanderson's June 15, 2011 paycheck.  But "because the net after-tax amount being paid" to Sanderson was applied to the Legal Fees Loan, "there were no after-tax funds available from which to withhold."  (*Id.* ¶¶ 27-28.)  Instead, Red Strokes notified Sanderson of the tax liability and remitted the amounts "on behalf of Sanderson, to the State and added [the amount] (as additional loaned funds)" to Sanderson's open loan file with Red Strokes.

Harris and Dennis took the same action with respect to a withholding order dated August 11, 2011, in the amount of $804.37.  (*Id.* ¶¶ 29-32.)  Dennis forwarded the notice to Sanderson on August 29, 2011, copying Harris on the email.  (*Id.*, Exs. Q-R.)  The same day, Sanderson responded to the email, copying Harris.  Sanderson thanked Dennis for passing along the August order and wrote, "I have sent it on to my business management firm/accountant."  (*Id.*, Ex. S; Docket No. 51, Ex. 4, Ex. A.)  Harris attests that Sanderson never directed Red Strokes to not make payments to the State of California on her behalf.  (Docket No. 51, Ex. 3, ¶ 33.)  Harris submits that the total amount paid by Red Strokes to the State of California was $2399.61.

(Docket No. 51, Ex. 3, ¶¶ 30-32.)  Red Strokes seeks recovery of this amount, as well as the full amount of the Legal Fees Loan, from Sanderson.

In her Affidavit, Sanderson asserts that she was unaware that Red Strokes paid any tax liens on her behalf or that Red Strokes claimed that the tax fees were a loan until after the filing of this lawsuit.  (Docket No. 45 ¶ 13.)  She also claims that she never authorized or requested, either verbally or in writing, that Red Strokes pay the Tax Loan on her behalf.  (*Id.*)  In opposition, Red Strokes submits that Sanderson was aware that Red Strokes was legally required to withhold the relevant amounts from her paycheck and that the net amount of her paycheck was already being applied to the Legal Fees Loan, and that Sanderson never instructed Harris or Red Strokes *not* to pay the withholding orders.  (Docket No. 51, Ex. 3, ¶ 33.)

## III.    **The Action**

Red Strokes filed its Complaint in the Circuit Court for Davidson County, Tennessee on November 16, 2011.  (Docket No. 1, Ex. 1.)  Sanderson removed the action to this court on January 5, 2012.  (Docket No. 1.)  On the same day, she filed a Motion to Dismiss for Lack of Jurisdiction or Transfer, requesting that, if the court did not dismiss the case, it should transfer the action to the District Court for the Central District of California.  (Docket Nos. 2-4; *see also* Docket No. 10.)  The court denied Sanderson's motion on May 1, 2012.  (Docket Nos. 18-19.) After an initial case management conference, the parties stipulated that all motions to amend the pleadings would be filed on or before March 1, 2013, and agreed to complete discovery on or before May 31, 2013.  (Docket No. 35.)

On April 15, 2013, Sanderson filed the California Action.  On July 31, 2013, Sanderson filed the pending Motion for Summary Judgment and the Request for Judicial Notice related to the California Action.

## ANALYSIS

### I.       Request for Judicial Notice

Sanderson has filed a Request for Judicial Notice in this action, requesting that the court take notice of her Complaint in the California Action. (Docket No. 44, Ex. 1). Red Strokes has not opposed the motion. The court hereby takes notice of the fact that the Complaint was filed, but it makes no determination as to the validity of the allegations contained therein.[9]

### II.      Rule 56 Standard

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Moldowan*, 578 F.3d at 374 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be

---

[9] *See* Fed. R. Evid. 201(b)-(d); *Granader v. Public Bank,* 417 F.2d 75, 82–83 (6th Cir. 1969).

insufficient," and the party's proof must be more than "merely colorable." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 252 (1986). An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III.     The Defendant's Motion

Sanderson moves for summary judgment on Red Strokes' default claims on two grounds: first, that the statute of limitations has expired on Red Strokes' claim for default of the Legal Fees Loan under California law; and second, that the terms of the oral agreements for both the Legal Fees Loan and Tax Loan are too vague to create a binding contract. Sanderson also asks the court to refrain from exercising jurisdiction over Red Strokes' declaratory relief claims in light of the pending lawsuit in California.

### A.  Statute of Limitations

In her motion, Sanderson asserts that a California statute of limitations ("SOL") for oral agreements bars Red Strokes' default claim for the Legal Fees Loan. For the reasons discussed herein, Sanderson's motion will be denied.

The parties agree that this court is bound by Tennessee choice of law rules.[10] (Docket No. 42, Ex. 1; *see also* Docket No. 51.) The parties dispute, however, which state's SOL should govern the oral agreement between Sanderson and Red Strokes regarding the Legal Fees Loan. Sanderson argues that the oral agreement is governed by California law because the Legal Fees Loan was "executed" in California. (Docket No. 42, Ex. 1 at 15.) She contends that California

---

[10] A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *See Standard Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 692 (6th Cir. 2013) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

has a two-year SOL on oral agreements and that the SOL runs from the formation of the agreement.[11]  Alternatively, Sanderson argues that Tennessee's "borrowing" statute, T.C.A. § 28-3-112, applies and, therefore, the court should import California's SOL to Red Strokes' claim and bar the Legal Fees Loan claim from proceeding.  (Docket No. 42, Ex. 1, at 11.)

In opposition, Red Strokes submits that Tennessee's statute of limitations should apply to the agreement because statutes of limitation are procedural matters.  (Docket No. 51.)  Red Strokes argues that the relevant Tennessee SOL provides for a six-year period that begins "on the date of the breach."  Red Strokes argues that, under Tennessee law, Red Strokes' cause of action did not accrue until Sanderson breached her contract to repay the loan in 2011.  (Docket No. 51 at 12.)  Moreover, Red Strokes argues that its cause of action for the Legal Fees Loan accrued in Tennessee because the cause of action arises where a debtor fails to perform her promise to pay. (*Id.* at 16 (citing *Pilcher v. Carroll*, 15 Tenn. App. 423, 426 (Ct. App. 1932)).)

There is substantial uncertainty in the record with respect to the formation of the alleged Legal Fees Loan and its terms.  With respect to the alleged oral agreement, the parties have submitted only a self-serving affidavit by Sanderson describing a conversation between herself and Brooks, without any detail as to time or place.  And contrary to Sanderson's assertions in her brief, the Sanderson Affidavit does not support a finding that the agreement was executed in

---

[11] Sanderson also argues that, if the court treated the Red Strokes loan as a "book account" under California's Code of Civil Procedure, California's four-year SOL would still bar Red Strokes' claim.  (Docket No. 42, Ex. 1 at 13.)  In light of the various disputes of material fact in the limited record before the court, the court lacks sufficient information at this stage to determine the appropriate governing law for the agreement as well as the agreement's appropriate categorization.

California.[12]  Sanderson additionally fails to submit any supporting documents or evidence to substantiate the generalized statements in her affidavit.

For its part, Red Strokes has also failed to submit testimony with respect to the location of the alleged loan agreement's formation and its terms.  However, Red Strokes offers plausible evidence from its accountants that indicates that a loan agreement was formed and executed between the parties and that substantial activity related to the loan occurred in Tennessee.  Harris attests that payments to Sanderson were facilitated by O'Neil Hagaman in Nashville, Tennessee and that money was transferred from Red Strokes' bank account at SunTrust Bank in Tennessee. (Docket No. 51, Ex. 3, ¶ 6.)  Moreover, documentary evidence—including correspondence and business records—substantiates Harris' testimony.  The evidence submitted by Red Strokes raises genuine issues of fact as to where the contract was formed and executed, where Red Strokes' cause of action for the Legal Fees Loan accrued, and what law governs the alleged loan agreement.

Sanderson's conclusory retelling of the Legal Fees Loan's formation—without more—is insufficient to resolve the disputes of fact as to the location of the loan's formation, execution, and its terms.  At this stage, the court lacks sufficient information to assess the merits of Sanderson's statute of limitations arguments because of these genuine disputes of material fact.

---

[12] Sanderson submits that her Statement of Undisputed Facts at Paragraphs 4-9 demonstrates that the alleged Legal Fees Loan was discussed and negotiated solely by Sanderson and Brooks *in California*.  (Docket No. 56 at 13.)  But Sanderson's SUMF and her testimony by affidavit do not match the arguments made in her brief; instead, Paragraphs 4-9 simply state that "Sanderson confided in Brooks concerning the personal legal matter in which she was involved" and "Brooks told Sanderson that he would pay the legal fees she incurred."  (Docket No. 43 ¶¶ 4-9.) Sanderson does not submit any evidence that demonstrates that the oral agreement was formed or executed in California.

Accordingly, Sanderson's Motion for Summary Judgment as to the time bar on Red Strokes' claim for the Legal Fees Loan will be denied.

### B. Enforceability of Contract Terms

For substantially the same reasons stated in the previous section, there is a genuine dispute of material fact as to whether Red Strokes and Sanderson entered into an enforceable contract. Sanderson submits in her affidavit that, even if the parties had entered into loan agreements, the terms of the Legal Fees Loan and the Tax Loan are too indefinite to be enforced as a matter of law. Sanderson offers no evidence to support her argument or to rebut the documentary evidence submitted by Red Strokes related to the loans. Consequently, Sanderson's generalized affidavit is insufficient to demonstrate that there is no issue of material fact as to the contract's validity.

Red Strokes submits correspondence that was exchanged contemporaneously with the loan's formation and execution. This correspondence indicates that Red Strokes considered the legal fees payments to be a loan. Red Strokes also submits testimony and business records from its accountants that sufficiently contradict many of Sanderson's naked assertions regarding the Legal Fees Loan's terms. Indeed, Red Strokes' accountants' testimony indicates that Sanderson *at the very least* possessed knowledge that O'Neil Hagaman—Red Strokes' accounting firm that she herself interacted with regularly—consistently treated the Legal Fees Loan as a loan. (*See, e.g.*, Docket No. 51, Ex. 3, Exs. E, H-K.) Red Strokes demonstrates that, as of 2007, Harris sent loan repayment schedules for the Legal Fees Loan to Sanderson. (*Id.* Exs. H-K.) Sanderson does not dispute that she was in close contact with Harris and Dennis at O'Neil Hagaman in her professional capacity over the period of the Legal Fees Loan and until her employment at Red Strokes ended. (Docket No. 51, Ex. 3.) Moreover, a reasonable jury could infer from Red

Strokes' evidentiary submissions that the Legal Fees Loan was known to both parties to be a loan, from the agreement's formation to Sanderson's alleged default.

Sanderson has also failed to convince the court that the terms of the Tax Loan were so indefinite as to be rendered unenforceable. Red Strokes has submitted evidence demonstrating that Sanderson was aware of at least the August Withholding Order and that she had "forwarded" the order along to her own accounting professional. Sanderson has failed to submit anything more than her own conclusory affidavit, which lacks context and fails to address the correspondence that contradicts her self-serving statements. (Docket No. 45 ¶ 13; Docket No. 51, Ex. 3, Ex. S.) Additionally, given the pattern of an alleged lending relationship between Red Strokes and Sanderson, a jury could reasonably find that both parties considered remittance of the tax fees to be a loan to be added to Sanderson's ongoing loan ledger.

Accordingly, because genuine issues of material fact exist as to whether the Tax Loan and Legal Fees Loan were sufficiently definite as to be enforceable, Sanderson's Motion for Summary Judgment must be denied.

## IV.        Abstention from Declaratory Judgment

In its Complaint, Red Strokes seeks a judgment from the court declaring (1) that no employment contract exists between Red Strokes and Sanderson; and (2) that Red Strokes owes Sanderson no fee, credit, or payment of any kind, either as a producer or as part of any severance or retirement package. Sanderson's complaint in the California Action pleads claims for violation of the California Labor Code related to wages, breach of oral agreement, breach of the implied covenant of good faith and fair dealing, and fraud, stemming from her employment at Red Strokes. (Docket No. 44, Ex. 1.) Sanderson asserts that, because the pending California Action implicates factual and legal issues that overlap with Red Strokes' claims here, this court

should exercise its discretion and abstain from adjudicating Red Strokes' declaratory relief claims. Red Strokes has filed a Demurrer to Sanderson's California suit as well as a Motion to Stay her case, both of which appear to be pending before the Los Angeles court. (Docket No. 51 at 25; *id.*, Ex. 1.)

## A. Standard

The Declaratory Judgment Act provides that, "in a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. Therefore, the Declaratory Judgment Act provides the district court with "unique and substantial discretion in deciding whether to declare the rights of litigants" and is an example of Congress' "creat[ing[ an opportunity, rather than a duty, to grant a new form of relief to qualifying litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-88 (1995).

In *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323 (6th Cir. 1984), the Sixth Circuit Court of Appeals articulated criteria a district court should consider when deciding whether to exercise this discretion. The court stated, "[t]he two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* at 326; *see also Scottdale Ins. Co. v. Roumph*, 211 F.3d 964, 968 (6th Cir. 2000). To assist in analyzing whether these criteria are met, the *Grand Trunk* court propounded a five-factor balancing test for the district court to use in weighing whether it should exercise its discretion and entertain a plaintiff's declaratory judgment action. *Id.* Those factors are: "(1) whether the

declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of 'procedural fencing' or 'to provide an arena for *res judicata*'; (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective." *Grand Trunk*, 746 F.2d at 326.

### B. Application

Sanderson requests that the court abstain from hearing the declaratory relief claims because of factors set forth by the Fourth Circuit in *Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co.*, 139 F.3d 419, 423 (4th Cir. 1998). *Aetna* proposed a balancing test similar to the *Grand Trunk* analysis. *Id.* Sanderson argues that, by exercising jurisdiction over Red Strokes' declaratory relief claims, this court would cause "unnecessary entanglement" between the federal and state court systems. Sanderson also asserts that Red Strokes has engaged in "procedural fencing and forum shopping" by bringing this suit in the federal court in Tennessee. Sanderson urges the court to apply the *Aetna* factors and abstain from exercising jurisdiction over Red Strokes' declaratory relief claims.

The appropriate test to be applied here is the Sixth Circuit's five-factor *Grand Trunk* balancing test. Assessing the *Grand Trunk* factors, the court is persuaded to maintain its jurisdiction over Red Strokes' declaratory relief claims.

### 1. Settlement of the Controversy

It is undisputed that the present action for declaratory relief involves at least some of the issues pending in the California Action and could lead to settlement of at least some of the controversies between the parties. The record is scant with respect to Red Strokes' declaratory

24

relief claims. Neither party has filed briefs related to the merits of Red Strokes' claims for declaratory relief, and little testimony has been submitted related to Sanderson's employment relationship with Red Strokes. But upon comparison of the meager record and the federal and state pleadings, it appears clear that overlapping material issues of fact exist as to the related claims in both actions. Consequently, a declaratory order in this action would have substantial— if not dispositive—effects on Sanderson's state court claims.

For instance, if the court were to grant Red Strokes' declaratory relief claim as to money owed between the parties, Sanderson's breach of oral agreement claim in the California Action would be significantly undercut, if not precluded. On the other hand, if the court were to deny Red Strokes' declaratory relief claims, the court's determinations of fact would be highly relevant to Sanderson's employment law claims in the California Action. Accordingly, the first factor weighs in favor of allowing Red Strokes' declaratory relief claims to proceed.

### 2. Clarification of Legal Relations at Issue

The second *Grand Trunk* factor also weighs in favor of Red Strokes, as discrete legal issues of Sanderson's claims related to her employment contract (if any) and relationship with Red Strokes could be clarified or resolved by this court's determinations of the status of the parties' relationship.

### 3. Procedural Fencing and *Res Judicata*

The third factor of "procedural fencing" is relevant here. A ruling for Red Strokes in this action may preclude some of Sanderson's claims in the California Action. However, the timing of the California Action weighs against the presumption of Red Strokes as a "forum shopper." Sanderson declined to file her employment and contract claims as counter-claims against Red Strokes here, which would have been appropriate, given their close ties to the factual

underpinnings of this action. Nevertheless, she waited to file the California Action until nearly a year and one-half after Red Strokes filed its declaratory relief claims, 11 months after this court denied her motion to transfer the action to California, and over six weeks after her window to file compulsory counter-claims in this action had expired. The chronology of Sanderson's initiation of the California Action suggests that Sanderson, and not Red Strokes, may have engaged in forum shopping by attempting to circumvent this court's jurisdiction and litigate issues inextricably bound to the declaratory relief claims in a more favorable forum.[13] The third *Grand Trunk* factor significantly favors Red Strokes.

4.      Federalism Concerns

The fourth *Grand Trunk* factor bears upon Sanderson's argument that Red Strokes' declaratory relief claims would lead to "unnecessary entanglement" between the state and federal courts. Sanderson fails to set forth a convincing argument that exercising jurisdiction over Red Strokes' declaratory relief claims here would "increase friction" between the federal and state systems or "improperly encroach" upon the California state court's jurisdiction. Although Sanderson is correct that California has an interest in determining Sanderson's rights as an employee under California law, this court has an interest in determining Red Strokes' rights as an employer and alleged party to a Tennessee contract. The fourth factor weighs in favor of neither party.

5.      Alternative Remedy

---

[13] Red Strokes informs the court that it has moved to dismiss the California Action on the grounds that Sanderson's claims should have been filed as compulsory counter-claims in this action. (Docket No. 51 at 24.)

Sanderson has failed to argue that litigating these issues in the California Action would result in a better or more effective remedy. The court finds that this factor is neutral.

6.   Balancing the Factors

Balancing all of the factors, Red Strokes' declaratory relief claims should properly proceed in this court.

Accordingly, for the reasons stated herein, Sanderson's request that the court refrain from exercising jurisdiction over Red Strokes' claim for declaratory judgment will be denied.[14]

## CONCLUSION

For the reasons discussed herein, the Defendant's Motion for Summary Judgment will be **DENIED**.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[14] The court makes no determination as to the merits of Red Strokes' declaratory relief claims, with respect to which the parties have offered limited evidence.